COURT OF CHANCERY
OF THE
STATE OF DELAWARE

CHRISTIAN DOUGLAS WRIGHT
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Date Submitted: February 17, 2026
Date Decided: April 14, 2026

Shant Hamassian
24033 Park Granada
Calabasas, CA 91302

Matthew W. Murphy, Esquire
Benjamin O. Allen, Esquire
Richards, Layton & Finger, P.A.
820 N. King Street
Wilmington, DE 19801

Re: *Shant Hamassian v. Cineverse Corp.*,
C.A. No. 2025-1437-CDW

Dear Litigant and Counsel:

Plaintiff Shant Hamassian demands inspection of certain books and records of defendant Cineverse Corp. under Section 220 of the Delaware General Corporation Law. Cineverse objects on several grounds, including that Hamassian has failed to state a proper purpose for his inspection. After carefully considering the evidence and arguments the parties presented, I agree with Cineverse that Hamassian has failed to prove he has a proper purpose for his inspection. Specifically, I find by a preponderance of the evidence that Hamassian's purpose for inspection is to advance his personal interests under contracts with Cineverse, not his interests as a Cineverse stockholder. I recommend that Hamassian's inspection demands be denied.

## I.  BACKGROUND

The parties consented to trial on a paper record without argument, so these are the facts as I find them based on the complaint,[1] the answer,[2] the parties' pretrial briefs,[3] and exhibits attached to the pleadings and briefs.

### A.  The Parties

Hamassian is a filmmaker and the director of two films: *A Really Nice Guy* and *Night of the Slasher*.[4]  In 2020, Hamassian entered into two distribution agreements for his films with Bloody Disgusting, LLC ("BD"), a privately held company in the business of streaming digital media.[5]  Cineverse is a publicly traded Delaware corporation in that is also engaged in the business of streaming digital media.[6]  Cineverse acquired BD in October 2021 and, with it, BD's rights and obligations under the distribution agreements.[7]

---

[1] Dkt. 1 ("Compl.").

[2] Dkt. 33 ("Ans.").

[3] Pl.'s Opening Pre-Trial Br., Dkt. 36 ("Opening Br."); Def.'s Answering Pre-Trial Br., Dkt. 37 ("Answering Br."); Pl.'s Reply Pre-Trial Br., Dkt. 39 ("Reply Br.").

[4] Compl. Ex. D-3; Answering Br. 8; *see* Answering Br. Exs. A–B.

[5] Answering Br. 7; *see* Answering Br. Ex. A (first distribution agreement), Ex. B (second distribution agreement).

[6] Ans. ¶ 7; Answering Br. 7.

[7] Answering Br. 7.

**B.     BD Agrees to Distribute Hamassian's Films**

On October 13, 2020, Hamassian and BD executed the first distribution agreement.[8]   The first agreement granted BD the right to distribute and sublicense *A Really Nice Guy*.[9]  On December 6, Hamassian and BD executed the second distribution agreement (together, "Distribution Agreements").[10] Under the Distribution Agreements, BD would pay Hamassian a percentage of the proceeds generated from his films and would provide Hamassian quarterly accountings.[11]

**C.     Cineverse Acquires BD and Hamassian's Royalties Are Lost
          in the Transition**

In October 2021, Cineverse acquired BD.[12]   What followed was a 20-month transition period as Cineverse integrated BD into its business.[13] The transition implemented new operating procedures at BD that impacted the timeliness of Hamassian's royalty payments and accountings.[14]

---

[8] Answering Br. Ex. A.

[9] *Id.* § 1.1.

[10] Answering Br. Ex. B § 1.1.

[11] Answering Br. Ex. A §§ 3–4; Answering Br. Ex. B §§ 3–4.

[12] Answering Br. 9.

[13] *See* Opening Br. 7; Answering Br. 8–9.

[14] *See* Compl. Ex. D at 2 ("the switchover has also created a lot of bumps in the processing of paperwork . . . .").

On June 4, 2023, Cineverse emailed certain filmmakers to share how the acquisition would impact their licensing agreements and renewals.[15] Hamassian responded and the parties traded emails on Hamassian's royalty payments and renewing the Distribution Agreements through October 4, 2024.[16]

**D.** **Hamassian Serves the First of Four Demands for Books and Records**

On February 7, 2025, Hamassian sent Cineverse his first demand to inspect books and records under Section 220 of the Delaware General Corporation Law ("First Demand").[17] The First Demand sought six categories of books and records for three purposes: (1) investigating mismanagement; (2) investigating "financial irregularities[;]" and (3) investigating possible breaches of fiduciary duties "related to [BD]'s licensing and revenue reporting practices."[18] Hamassian stated his investigatory purposes were proper because Cineverse "failed to send the **16 required quarterly revenue and profit statements** regarding [Hamassian's] licensed short film . . . in violation of

---

[15] *Id.*

[16] *See id.* at 2–9.

[17] Answering Br. Ex. C ("First Demand"). *See also* Opening Br. 6; Answering Br. 9.

[18] First Demand 1.

[their] agreement" and that Cineverse "has cited ongoing 'accounting issues' . . . as the reason for non-compliance."[19]

The First Demand also alleged that Binge Society Dark, to whom Cineverse sublicensed the rights to *Night of the Slasher*, had "improperly altered" the film and misattributed ownership of its copyright.[20] As Hamassian reasoned, these indicated Cineverse "fail[ed] to oversee sublicensed content" and that the alleged copyright misattribution "expos[ed] Cineverse to unnecessary legal and financial risk."[21]

The First Demand was mailed with two attachments. The first attachment was a document titled "Affirmation of Proper Purpose" with a notarized jurat.[22] The second was a transaction receipt indicating Hamassian purchased one share of Cineverse stock 22 days earlier via the online brokerage platform Robinhood.[23]

---

[19] *Id.*

[20] *Id.*1–2.

[21] *Id.*

[22] *Id.* 3–4.

[23] *Id.* 5–6.

### E. Hamassian Sends His Second and Third Demands in Rapid Succession

On February 24, Hamassian sent Cineverse a second letter demanding to inspect its books and records ("Second Demand").[24]  The Second Demand listed the same purposes for which Hamassian sought to inspect documents as the First Demand and recited the same allegations of wrongdoing.[25]  But the Second Demand omitted the records Hamassian wished to inspect, proof of his stock ownership, and evidence the Second Demand was made under oath.[26]

On March 18, Hamassian sent a third letter demanding Cineverse permit him to inspect five categories of its books and records ("Third Demand").[27]  Much like the First Demand, the Third Demand only sought documents related to *Night of the Slasher*.[28]  Like the previous two demands, the Third Demand largely recycled Hamassian's allegations about Cineverse's conduct and his proper purposes.[29]  And, like the Second Demand, no sworn statement or proof

---

[24] Answering Br. Ex. D. ("Second Demand"); Answering Br. 11; *see* Opening Br. 6. A "jurat" is "[a] certification added to an affidavit or deposition stating when and before what authority the affidavit or deposition was made." *Jurat*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[25] *Compare* Second Demand, *with* First Demand.

[26] *Contrast* Second Demand, *with* First Demand.

[27] Answering Br. Ex. E. ("Third Demand"); Answering Br. 13; *see* Opening Br. 6.

[28] *Compare* Third Demand, *with* First Demand.

[29] *Compare* Third Demand, *with* Second Demand, *and* First Demand.

of stock ownership accompanied the Third Demand. But in the Third Demand Hamassian alleged a new basis to suspect mismanagement: Cineverse's alleged unauthorized use of *Night of the Slasher* following the Distribution Agreements' expiration in September 2024.[30]

### F. Hamassian Sends His Fourth and Final Demand

On April 2, Hamassian sent a fourth letter demanding to inspect five categories of Cineverse's books and records ("Fourth Demand" and, collectively with the First, Second and Third Demands, "Demands").[31] The Fourth Demand omitted any mention of Hamassian's purpose for seeking the requested records. Rather, Hamassian recanted a litany of facts to conclude that Cineverse willfully violated Delaware law, and its practices constituted "gross financial mismanagement and potential accounting fraud."[32]

Hamassian claimed Cineverse failed to produce quarterly accountings as required by the Distribution Agreements, which "represent[s] at least **16 separate breaches** of contract."[33] The Fourth Demand also repeated

---

[30] Third Demand 2.

[31] Answering Br. Ex. F. ("Fourth Demand") 1, 4.

[32] Fourth Demand 2–4.

[33] *Id.* 3.

Hamassian's allegations about copyright misattribution and Cineverse's unauthorized use of his films after the Distribution Agreements expired.[34]

Hamassian appended seven pages of attachments to the Fourth Demand, including the same transaction receipt attached to the First Demand[35] and a signed and notarized affidavit.[36]

On May 9, Cineverse sent Hamassian a letter declining to produce its books and records.[37] Cineverse concluded that Hamassian's purpose was to vindicate his rights—not one related to his interest as a stockholder. Cineverse informed Hamassian of its position that he "may not use Section 220 for *individual* purposes" or "to investigate *personal* contractual and copyright claims"[38] and that, regardless, the Demands "fail[ed] to comply with Section 220[.]"[39] The parties corresponded about resolving Hamassian's concerns, but were ultimately unable to come to a resolution.[40]

---

[34] *Compare* Fourth Demand, *with* First Demand, *and* Second Demand, *and* Third Demand.

[35] *Compare* Fourth Demand 9–10, *with* First Demand 5–6.

[36] Fourth Demand 7.

[37] Compl. Ex. C-1; Answering Br. 16.

[38] Compl. Ex. C-1 at 4.

[39] *Id.* 6.

[40] Answering Br. 16–17; Compl. Ex. C-2;

## II.    PROCEDURAL POSTURE

On December 11, Hamassian filed the Complaint, seeking to inspect the books and records identified in all of the Demands.[41]   On December 24, Hamassian filed a Motion to Establish Schedule with a proposed scheduling order.[42]   On December 30, the court held the motion in abeyance until Cineverse was served with the Complaint.[43]   Cineverse's counsel entered their appearance less than 20 minutes later.[44]

On January 12, 2026, Cineverse sent a letter informing the court that the parties could not agree on a case schedule and provided their proposed scheduling order.   The court granted Cineverse's proposed case schedule and denied Hamassian's the next day.[45]

On January 20, Cineverse answered the Complaint.[46]   On February 2, Hamassian filed his opening brief.[47]   On February 11, Cineverse filed its answering brief.[48]   On February 16, Hamassian filed his reply brief.[49]

---

[41] Dkts. 1, 5–21.

[42] Dkt. 26.

[43] Dkt. 27.

[44] Dkt. 28.

[45] Dkts. 30–31.

[46] Dkt. 33.

[47] Dkt. 36.

[48] Dkt. 37.

The court held a pretrial conference on February 17.[50]  At the pretrial conference the parties stipulated to a ruling on the paper record without trial.[51] The court took the matter under advisement on that date.

### III.  ANALYSIS

"Section 220 of the Delaware General Corporation Law provides a 'qualified' right for stockholders to inspect corporate books and records." *Scarantino v. Trade Desk, Inc.*, 2025 WL 3496644, at *3 (Del. Ch. Dec. 5, 2025) (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006)).  Among other things, Section 220(b) requires all demands to inspect a corporation's books and records be "made in good faith and for a proper purpose" and that "[t]he books and records sought [in the demands] are specifically related to the stockholder's purpose."  8 *Del. C.* § 220(b)(2)a., c.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).  A proper purpose is "a purpose reasonably related to a stockholder's interest as a stockholder." 8 *Del. C.*

---

[49] Dkt. 39.

[50] Dkt. 40.

[51] *Id.*

§ 220(a)(2). While "[t]here is no shortage of proper purposes under Delaware law,"[52] "the [stockholder's] purpose must be something that stockholders would be interested in *because of their position as stockholders.*" *Lynn v. EnviroSource, Inc.*, 1991 WL 80242, at *2 (Del. Ch. May 13, 1991). "A purely individual purpose . . . is not a proper purpose within the meaning of" Section 220. *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1033 (Del. 1996). "Merely stating that one has a proper purpose . . . is necessarily insufficient." *Melzer*, 934 A.2d at 917. Hamassian thus bears the initial burden of proving he possesses a proper purpose for the inspection by a preponderance of the evidence. 8 *Del. C.* § 220(c).[53]

Hamassian argues he seeks to investigate mismanagement and wrongdoing at Cineverse, specifically "to evaluate whether Cineverse maintained corporate oversight and internal controls relating to royalty reporting/payment workflows, license-term tracking, and associated compliance and escalation practices[.]"[54] He contends that the Demands are directed at "corporate governance and oversight" not "bilateral contractual obligations

---

[52] *E.g.*, *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007).

[53] *See, e.g.*, *Peneff Hldgs. LLC v. Nurture Life, Inc.*, 2024 WL 3964006, at *4 (Del. Ch. Aug. 28, 2024) (applying the same standard when interpreting the previous version of Section 220).

[54] Opening Br. 14.

between Cineverse" and himself.[55] Hamassian also argues that having "[m]ixed motives" does not discredit his other purposes.[56] Cineverse, for its part, argues that the Demands identify no purpose for inspection relating to Hamassian's status as a Cineverse stockholder, but instead make it clear Hamassian is only seeking "to investigate potential personal claims for breach of contract and copyright infringement" arising out of or relating to the Distribution Agreements[57] Cineverse is correct.

"When a corporation has reason to believe the stockholder plaintiff has advanced a purpose that does not reflect its true purpose, the corporation '[u]nquestionably is entitled to challenge the plaintiff's stated purpose and to show that as a factual matter, the plaintiff's true purpose is other than what is stated in the demand.'" *Georgia Notes 18, LLC v. Net Element, Inc.*, 2021 WL 5368651, at *3 (Del. Ch. Nov. 18, 2021) (citing authorities). The test for determining whether a claim is reasonably related to one's interest as a stockholder is straightforward: if the stockholder were divested of their stock,

---

[55] *Id.*

[56] *Id.* 16.

[57] Answering Br. 21.

would their interest in the books and records they seek be diminished? *EnviroSource*, 1991 WL 80242, at *3.[58]  Here, the answer is clearly no.

Throughout the Demands, Hamassian only alleges wrongdoing and seeks records related to his rights under the Distribution Agreements and personal copyright claims stemming from his films.[59]  Other evidence supports this.  In his responses to Cineverse's interrogatories, Hamassian admitted that he "requested information regarding accounting/revenue and related matters" in or around June 2023—18 months before he became a Cineverse stockholder.[60] The fact that Hamassian sought the *same* information he seeks in this litigation *before* he became a stockholder shows his interest is not one "any other stockholders would share[.]"  *Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*, 2004 WL 1945546, at *7 (Del. Ch. Aug. 30, 2004). Hamassian's investigatory purpose arises only from his contractual relationship with Cineverse under the Distribution Agreements, not his interest as a Cineverse stockholder.  "Section 220 is not a tool available to advance non-stockholder interests[.]" *Net Element*, 2021 WL 5368651, at *4.  Hamassian

---

[58] *Accord Net Element*, 2021 WL 5368651, at *4 (denying an inspection where the stockholder sought records "to enhance his claim as a creditor").

[59] *See generally* First Demand, Second Demand, Third Demand, Fourth Demand.

[60] *See* Interrog. No. 8, Answering Br. Ex. G.

thus does not have a proper purpose for the inspection, so I decline to order Cineverse to produce books and records.

## IV. CONCLUSION

Hamassian does not have a proper purpose for his demands for Cineverse's books and records. I recommend inspection be denied on that basis. I do not reach Cineverse's arguments that (1) the Demands fail to satisfy Section 220's form-and-manner requirements and (2) Hamassian has failed to prove the documents he seeks are necessary and essential to a properly stated purpose.

This is a Final Report under Court of Chancery Rule 144(b)(2). Under Court of Chancery Rule 144(d)(1), any party who wishes to file exceptions to this report must file their notice of exceptions by April 17, 2026.

Very truly yours,

/s/ *Christian Douglas Wright*

Magistrate in Chancery