IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERTA ANN K.W. WONG LEUNG REVOCABLE TRUST U/A DATED 03/09/2018, | § § § § | No. 487, 2024 |
| | § | Court Below—Court of |
| Plaintiff Below, | § | Chancery of the State of |
| Appellant, | § | Delaware |
| | § | |
| v. | § | C.A. No. 2023-1251 |
| | § | |
| AMAZON.COM, INC., | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: May 14, 2025
Decided: July 28, 2025

Before **SEITZ**, Chief Justice; **LEGROW**, and **GRIFFITHS**, Justices.

Upon appeal from the Court of Chancery. **REVERSED**.

Samuel L. Closic, Esq., Seth T. Ford, Esq., PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Brian J. Robbins, Esq., Stephen J. Oddo, Esq., Gregory E. Del Gaizo, Esq., Michael J. Nicoud, Esq., ROBBINS LLP, San Diego, California; Daniel B. Rehns, Esq., Scott Jacobsen, Esq., HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York, *for Appellant Roberta Ann K.W. Wong Leung Revocable Trust U/A Dated 03/09/2018*.

Garrett B. Moritz, Esq., Dylan T. Mockensturm, Esq., Benjamin M. Whitney, Esq., ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; William Savitt, Esq., Anitha Reddy, Esq., Adam M. Gogolak, Esq., Alexis J. Abboud, Esq., Alyssa M. Hunt, Esq., WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *for Appellee Amazon.com, Inc*.

**GRIFFITHS**, Justice:

An Amazon stockholder sent a letter to the company demanding to inspect its books and records under Section 220 of the Delaware General Corporation Law. The stockholder's purpose was to investigate possible wrongdoing and mismanagement by Amazon. The stockholder believed that Amazon had engaged in anticompetitive activities in the United States and Europe. When the stockholder and Amazon could not agree to certain conditions for producing the records, the stockholder filed this action in the Court of Chancery. A Magistrate in Chancery conducted a one-day trial. The Magistrate then issued a final report and concluded that the stockholder did not meet its burden to prove a "credible basis" from which the court could infer possible wrongdoing by Amazon. The stockholder disagreed and took exceptions to the final report. In a written opinion, a Vice Chancellor adopted the final report's conclusion but did not reach its credible basis analysis. Instead, the Vice Chancellor concluded that the scope of the stockholder's stated purpose was so overbroad that it was "facially improper" and not "lucid."

On appeal, the stockholder seeks reversal of the Magistrate's final report and the Vice Chancellor's opinion. Based on the record before us, we find that the Vice Chancellor erred in the interpretation of the scope of the stockholder's stated purpose and was required to engage with the evidence presented. Additionally, we find that the evidence—including a complaint filed by the Federal Trade Commission against

Amazon for alleged violations of antitrust laws that largely survived a motion to dismiss—establishes a credible basis from which a court can infer possible wrongdoing by Amazon. We reverse and remand for further proceedings.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. General Background

Appellant Roberta Ann K.W. Wong Leung Revocable Trust U/A Dated 03/09/2018 (the "Trust") is a stockholder of Appellee Amazon.com, Inc. Amazon is a Delaware corporation, earning revenue primarily by selling a vast array of products and services online.[3] Amazon fulfills customer orders from North America and internationally.[4] In recent years, Amazon has faced regulatory scrutiny in the United States and internationally for purported anticompetitive activities. These government inquiries have led to challenges from Amazon's stockholders alleging possible wrongdoing and mismanagement by its fiduciaries.

---

[1] The stockholder's demand for books and records was made in October 2023. Thus, the recent amendments to 8 *Del. C.* § 220 do not apply to this action and we apply the law in effect at the time of the demand. *See* S. Substitute 1 for S.B. 21, 153rd Gen. Assemb., Reg. Sess. § 3 (Del. 2025) (enacted) ("Sections 1 and 2 of this Act do not apply to or affect any action or proceeding commenced in a court of competent jurisdiction that is completed or pending, or any demand to inspect books and records made, on or before February 17, 2025.").

[2] Certain facts are undisputed, and we draw them from the two decisions relevant for this appeal. *See Roberta Ann K.W. Wong Leung Revocable Trust U/A Dated 03/09/2018 v. Amazon.com, Inc.*, 2024 WL 1916089 (Del. Ch. May 1, 2024) [hereinafter *Final Report*]; *Roberta Ann K.W. Wong Leung Revocable Trust U/A Dated 03/09/2018 v. Amazon.com, Inc.*, 2024 WL 4564754 (Del. Ch. Oct. 24, 2024) [hereinafter *Chancery Opinion*].

[3] App. to Answering Br. at B31, B61 (Amazon 2023 Form 10-K) [hereinafter B__].

[4] B31 (Amazon 2023 Form 10-K).

**B.    The Demand**

In October 2023, the Trust sent Amazon a letter demanding to inspect its books and records under 8 *Del. C.* § 220 (the "Demand").[5]  In the Demand, the Trust stated that its "proper purpose is to investigate potential corporate mismanagement, wrongdoing, and waste by fiduciaries of [Amazon], including the Board of Directors . . . and executive officers of Amazon."[6]  The Demand also stated that the Trust "is concerned that Amazon's fiduciaries have authorized or allowed [Amazon to] take unlawful advantage of [its] dominant [marketplace] position to engage in anticompetitive practices, leading to U.S. and international regulatory scrutiny, lawsuits, and fines."[7]  The Trust was also "concerned that Amazon utilized a set of interlocking anticompetitive and unfair strategies to illegally maintain its monopoly power that benefits the products it makes and sells internally versus third-party sellers that utilize [Amazon]'s marketplace."[8]

### 1.  The "History of Monopolistic Behavior"

As a basis for inspection, the Demand included a chronology of "Amazon's history of monopolistic behavior."[9]  The chronology contained the following events:

---

[5] *Final Report* at *4; App. to Opening Br. at A976–96 (Demand Letter) [hereinafter A___].

[6] A976 (Demand Letter).

[7] *Id.*

[8] *Id.*

[9] A977–82 (Demand Letter).

- In September 2019, the European Commission—the European Union's executive body—opened a formal antitrust investigation to assess Amazon's use of sensitive data from independent sellers on its marketplace to determine whether any use violated European Union competition rules.[10]

- In April 2020, the *Wall Street Journal* published an article concerning Amazon's use of data from independent sellers on its platform to develop competing products, which purportedly violated Amazon's own policies.[11]

- In May 2020, the U.S. House of Representatives sent a letter to Amazon's former CEO, Jeff Bezos, seeking to investigate whether previous statements made by Amazon personnel to the House Judiciary Committee regarding Amazon's business practices were misleading given the *Wall Street Journal* article.[12]  In July 2020, Bezos testified before the Subcommittee on Antitrust, Commercial and Administrative Law of the Judiciary Committee of the U.S House of Representatives (the "Congressional Subcommittee").[13]  The Congressional Subcommittee later issued a report that made policy recommendations but did not find that Amazon violated antitrust laws.[14]

- In November 2020, the European Commission "informed Amazon of its preliminary view that it has breached [European Union] antitrust rules by distorting competition in online retail markets," finding that Amazon "systematically rel[ied] on non-public business data of independent sellers who sell on its marketplace, to the benefit of Amazon's own retail business, which directly competes with those third party sellers."[15]  Around the same time, the European Commission opened a second formal antitrust investigation "into the possible preferential treatment of Amazon's own retail offers and those of marketplace sellers that use Amazon's logistics and delivery

---

[10] A977 (Demand Letter); *see also Final Report* at *1; *Chancery Opinion* at *5.

[11] A977–78 (Demand Letter); *see also Final Report* at *2.

[12] A979 (Demand Letter); *see also Chancery Opinion* at *5.

[13] A979 (Demand Letter); *see also Final Report* at *1–2; *Chancery Opinion* at *5.

[14] *Final Report* at *2.

[15] A981 (Demand Letter); A500 (Nov. 10, 2020 European Commission Press Release).

services."[16]    In December 2022, Amazon made certain formal commitments to the European Commission to address the European Commission's concerns.[17]   According to *Forbes*, Amazon avoided a $47 billion fine with these commitments.[18]

- In December 2021, Italy's antitrust regulator, the Italian Competition Authority, issued a decision against certain Amazon subsidiaries, finding that some of their practices infringed European Union competition rules.[19]   The Italian Competition Authority imposed remedial actions and a €1.13 billion fine.[20]

- In January 2022, the State of Washington sued Amazon after examining its practices regarding the treatment of third-party sellers on its marketplace.[21]   The parties shortly thereafter entered into a consent decree, whereby Amazon agreed to stop its "Sold by Amazon" program and further agreed to give the Washington Attorney General's Office annual updates on its compliance with antitrust laws.[22]   Amazon also paid $2.25 million "for recovery of [the Attorney General's] costs and attorneys' fees."[23]

- In September 2022, the State of California sued Amazon alleging that it violated California antitrust and unfair competition laws by contracting with its third-party sellers and wholesale suppliers to

---

[16] A981 (Demand Letter); A500 (Nov. 10, 2020 European Commission Press Release).

[17] A981 (Demand Letter); A625–28 (Dec. 20, 2022 European Commission Press Release).

[18] A632 (Mark Faithfull, *Amazon Alters Business Practices to Avoid Possible $47bn European Fine*, Forbes (Dec. 21, 2022)).

[19] A993 (Demand Letter); *Final Report* at *2; *Chancery Opinion* at *6.

[20] A993 (Demand Letter); A657 (Amazon Form 10-Q).  Amazon has reported that it paid the fine but is seeking to recover it pending resolution of all appeals.  A657 (Amazon Form 10-Q); *Final Report* at *2.

[21] A981–82 (Demand Letter); A502–03 (Jan. 26, 2022 Washington Attorney General Press Release).

[22] A981–82 (Demand Letter); A502–03 (Jan. 26, 2022 Washington Attorney General Press Release); A508–09 (Jan. 26, 2022 Consent Decree).

[23] A508–10 (Jan. 26, 2022 Consent Decree); A502–03 (Jan. 26, 2022 Washington Attorney General Press Release).

prevent competition.[24]  In March 2023, the California court overruled Amazon's demurrer to the State of California's complaint.[25]

Although these investigations and litigations serve as a basis for making the Demand upon Amazon, the gravamen of the Demand focuses on another governmental action.

### 2. *The Federal Trade Commission Action*

Central to the Demand is a complaint filed by the Federal Trade Commission ("FTC") against Amazon alleging twenty violations of state and federal antitrust laws.[26]  In September 2023, the FTC—joined by seventeen states—filed a complaint in the Western District of Washington, alleging that Amazon had a "durable monopoly power" in the "online superstore market" and the "online marketplace services market."[27]  The FTC conducted a "four-year investigation" before filing the complaint.[28]  During that investigation, Amazon produced millions of pages of documents and more than one hundred pages of written interrogatory responses.[29]

---

[24] A982 (Demand Letter); A541, A620–22 (Sept. 15, 2022 State of California Complaint).

[25] A982 (Demand Letter); A637, A643–52 (Mar. 30, 2023 Order on Amazon's Demurrer).

[26] A982–92 (Demand Letter); A725–896 (FTC Complaint).  Much of the Demand emphasized the alleged monopoly powers described in the FTC complaint. *See* A982–92 (Demand Letter) (detailing Amazon's alleged monopolies in the online superstore market and the online marketplace services market).  The Trust noted that "[a]nother concern is the purposeful hindrance of the FTC's investigation prior to the FTC [complaint] being filed."  A977 (Demand Letter).

[27] A727 (FTC Complaint).

[28] A1335 (Dec. 15, 2023 Joint Status Report and Discovery Plan in FTC Action).

[29] *Id.* ("During [the FTC] investigation, Amazon produced to the FTC and certain States approximately 1.7M documents (totaling nearly 10 million pages) from more than 130 custodians negotiated with the FTC (using search terms requested by the FTC), more than 100 terabytes of

In September 2024, the district court granted in part and denied in part Amazon's motion to dismiss the FTC complaint, with most claims surviving the motion-to-dismiss stage.[30]

### 3. Incorporating the FTC Action into the Demand

Based on the allegations and events in the FTC action, the Trust demanded to inspect books and records related to, among other things, Amazon's "compliance with antitrust or competition laws, including state and federal antitrust laws in the U.S. and in the EU, including investigations into Amazon's compliance with such laws and lawsuits filed against [Amazon] regarding antitrust laws or anticompetitive conduct, including, but not limited to, the FTC [c]omplaint, California's lawsuit, and Washington's lawsuit."[31]  The Trust also demanded to inspect documents regarding director independence.[32]

A few weeks after the Trust sent the Demand, Amazon responded that the Demand did not state a proper purpose and was overbroad in scope, but Amazon

---

data, and responded to 21 interrogatories (not including subparts) resulting in 130 pages of written responses by Amazon, and numerous informal requests for information."). Amazon made these representations to the district court in the FTC action. *See* A1334 (Dec. 15, 2023 Joint Status Report and Discovery Plan in FTC Action) (noting that these representations constitute Amazon's position).

[30] *See* A2274–76 (Sept. 30, 2024 District Court Order).  The federal claims under the Sherman Act and the FTC Act survived, as well as a number of state law claims. *Id.*  Nearly every claim survived or was dismissed without prejudice with leave to amend. *Id.*

[31] A993–94 (Demand Letter).

[32] A995 (Demand Letter).

agreed to produce a "targeted set of materials" on the condition that the Trust enter into a confidentiality agreement.[33] Amazon proposed a confidentiality agreement that included a jurisdictional restriction limiting the use of any inspection materials to litigation in a Delaware forum.[34] The Trust did not agree to that restriction and, in December 2023, filed this Section 220 action.

### C. A Previous Section 220 Action Involving Amazon

The Magistrate's final report and the Vice Chancellor's opinion in this case relied in part on an earlier Section 220 action against Amazon brought by a different stockholder. An overview of that case, *Oklahoma Firefighters Pension and Retirement System v. Amazon.com, Inc.*,[35] provides context to this action.

There, a stockholder filed a Section 220 action against Amazon—after Amazon had produced board-level documents—seeking to investigate certain anticompetitive conduct in the United States, as well as potential mismanagement regarding compliance with South Carolina tax laws. Relevant here is the anticompetitive conduct analysis. The Court of Chancery denied the stockholder's request for books and records beyond those already produced, holding that "the evidence of potential malfeasance regarding alleged anticompetitive conduct lacks

---

[33] *Final Report* at *4.

[34] *Id.*

[35] *Oklahoma Firefighters Pension and Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618 (Del. Ch. June 1, 2022).

the sort of 'plus factor' found in" similar Section 220 actions "where ongoing government investigations and lawsuits contributed to the satisfaction of the credible basis standard."[36]

The court primarily found that: (a) the Congressional Subcommittee investigation ended with no findings of antitrust violation by Amazon; (b) certain federal government investigations were "evidenced solely by news articles, which report on the existence of the investigations but lack any credible suggestion that Amazon has engaged in wrongdoing"; (c) a recently reported SEC investigation was "not evidence supporting an inference of possible misconduct" for the same reasons as the other federal government investigations; and (d) the European Commission investigation concerned breach of European Union competition laws, but the demand concerned only domestic laws.[37] The court likewise found that the Italian Competition Authority's €1.13 billion fine did not relate to domestic anticompetition laws.[38] Many of these factual and legal conclusions were later relied on by the Magistrate and Vice Chancellor in the current action to deny the Trust's inspection request.

---

[36] *Id.* at *8.

[37] *Id.*

[38] *Id.* at *10 ("[A]lthough a substantial fine could provide the sort of plus factor needed where the plaintiff's suspicions are based on government investigations and litigation without adverse outcomes, the fine concerns Italian law—which is extraneous to the plaintiff's stated purpose."). The court also noted that the fine "was neither raised in the demand nor timely introduced in this litigation." *Id.* at *9.

**D.     The Magistrate's Final Report**

In April 2024, the Trust presented its case for inspection during a one-day trial on a paper record before a Magistrate. A few days later, the Magistrate filed a final report, concluding that the Trust "has failed to present sufficient evidence to suggest a credible basis from which the [c]ourt can infer possible wrongdoing."[39] The Magistrate first noted the "developments" since the *Amazon.com, Inc.* decision, including the 2022 actions filed by the States of Washington and California; the agreement between Amazon and the European Commission concerning certain commitments Amazon made in response to the European Commission's investigation; and the 2023 FTC complaint. Because the Court of Chancery in *Amazon.com, Inc.* found that the evidence there did not support a credible basis to suspect wrongdoing, the Magistrate here relied on those findings and focused on "developments" since the *Amazon.com, Inc.* decision.[40]

The Magistrate stated that the FTC complaint "pleads allegations, not evidence," and unlike successful Section 220 actions based on government complaints, the FTC complaint "does not extensively quote testimony or attach the documents on which it relies, so the [c]ourt cannot evaluate the underlying evidence

---

[39] *Final Report* at *1.

[40] *Id.* at *6; *see also id.* at *2–3, *6 (citing *Amazon.com, Inc.*'s "additional evidence" and "plus factor" analysis favorably); *Chancery Opinion* at *3 (stating that the Magistrate "concluded that the cited developments post-*Amazon.com* lacked the sort of 'plus factor' beyond mere inquiries that could satisfy the credible basis standard").

'to determine if there exists an inference of wrongdoing.'"[41]  The Magistrate next determined that the State of Washington action ended with a consent decree where Amazon did not admit liability and paid "a relatively small amount to defray the costs of the Washington Attorney General's investigation,"[42] and the State of California action "has not, at least in its early stages, resulted in any adverse outcome for Amazon."[43]  The Magistrate stated that the European Commission did not find that Amazon violated the law, and it did not impose a fine.[44]  Last, the Magistrate considered the Italian Competition Authority's €1.13 billion fine, stating that it "present[ed] a closer call" but "is still under appeal" and that the fine represented less than one percent of Amazon's 2023 revenues.[45]

Based on these findings, the Magistrate recommended that the court deny the Trust's inspection demand.  The Magistrate concluded that when "[v]iewing the evidence in the aggregate, [the Trust] falls short of establishing a credible basis to investigate wrongdoing" because it identified "a handful[] of lawsuits, many of

---

[41] *Final Report* at *7 (quoting *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *7 n.92 (Del. Ch. Feb. 28, 2018)).

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

which merely repeat the allegations in the FTC [c]omplaint" and established only that Amazon has paid "relatively minor amounts."[46]

### E. The Vice Chancellor's Opinion

The Trust took exceptions to the Magistrate's final report, and, in July 2024, a Vice Chancellor heard argument.[47] Before the court issued a decision, the Trust filed a letter notifying the court that the FTC complaint had largely survived Amazon's motion to dismiss.[48]

The court denied the Trust's inspection demand. Although the Vice Chancellor "adopted" the Magistrate's final report, the court concluded that it was unnecessary to decide whether the Trust satisfied its credible basis burden because "[t]here is a more fundamental problem with the Trust's demand: the scope of its stated purpose is facially improper."[49]

To support its facially improper holding, the court quoted the Demand's language stating that the Trust sought to investigate whether "Amazon's fiduciaries have authorized or allowed [Amazon to] take unlawful advantage of [its] dominant

---

[46] *Id.* at *8–9.

[47] *Chancery Opinion* at *3.

[48] *Id.*; A2223–24 (Oct. 8, 2024 Letter from Trust's Attorney to Court of Chancery).

[49] *Chancery Opinion* at *4 ("I need not resolve whether the FTC [c]omplaint supports a credible basis to suspect possible wrongdoing. Nor must I consider whether the FTC [c]omplaint plus other evidence offered satisfies the Trust's burden. There is a more fundamental problem with the Trust's demand: the scope of its stated purpose is facially improper.").

position to engage in anticompetitive practices, leading to U.S. and international regulatory scrutiny, lawsuits, and fines."[50]  According to the court, that purpose was "astoundingly broad" and "concerns *any* possible anticompetitive conduct by a global conglomerate at *any* time *anywhere* in the world."[51]  The court concluded that "[w]hether the Trust has put forward sufficient evidence to satisfy the credible basis standard is meaningless when it failed to articulate a lucid purpose in the first place."[52]

The Trust has appealed both the Vice Chancellor's ruling as to the scope of the Trust's purpose, and the Magistrate's credible basis ruling.

## II.  STANDARD OF REVIEW

"We review *de novo* whether a stockholder's stated purpose for demanding inspection under Section 220 is a 'proper purpose.'"[53]  "When a stockholder seeks to investigate corporate wrongdoing," the Court of Chancery's determination that a credible basis exists to infer wrongdoing "is a mixed finding of fact and law, to which we afford considerable deference."[54]

---

[50] *Id.* at *5 (alterations in original).

[51] *Id.* (emphasis in original).

[52] *Id.* at *6.

[53] *AmerisourceBergen Corp. v. Lebanon Cnty. Emplys.' Ret. Fund*, 243 A.3d 417, 424 (Del. 2020) (quoting *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 287 (Del. 2010)).

[54] *Id.* at 424–25; *see also Axcelis Techs., Inc.*, 1 A.3d at 287 ("A trial judge's determination that a credible basis does (or does not) exist to infer managerial wrongdoing is a mixed finding of fact

## III.    ANALYSIS

"Section 220(c) provides that stockholders who seek to inspect a corporation's books and records must establish that '(1) [s]uch stockholder is a stockholder; (2) [s]uch stockholder has complied with [Section 220] respecting the form and manner of making demand for inspection of such documents; and (3) [t]he inspection such stockholder seeks is for a proper purpose.'"[55]  "A proper purpose is a 'purpose reasonably related to such person's interest as a stockholder.'"[56]  This Court has stated that "corporate wrongdoing . . . in and of itself" is "a legitimate matter of concern that is reasonably related to [a stockholder's] interest[] as [a] stockholder."[57] Further, "when a stockholder investigates meritorious allegations of possible mismanagement, waste, or wrongdoing, it serves the interests of all stockholders 'and should increase stockholder return.'  It follows that, under such circumstances, the stockholder's purpose is proper."[58]  "Delaware [] stockholders seeking inspection under [S]ection 220 must present 'some evidence' to suggest a 'credible basis' from

---

and law that is entitled to considerable deference."); *NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys.*, 282 A.3d 1, 12 (Del. 2022).

[55] *AmerisourceBergen Corp.*, 243 A.3d at 425 (alterations in original) (quoting 8 *Del. C.* § 220(c) (2010)).

[56] *Id.* (quoting 8 *Del. C.* § 220(b) (2010)).

[57] *Id.* at 428 (ellipsis added) (alterations in original) (citation omitted).

[58] *Id.* (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006)).

which a court can infer that mismanagement, waste or wrongdoing may have occurred."[59]

## A. The court erred in its interpretation of the scope of the Trust's purpose.

The Trust contends that the court erred in holding that the "scope of [the Trust's] stated purpose is facially improper" as it was "astoundingly broad" and "failed to articulate a lucid purpose."[60] The Trust also claims that the court incorrectly "interpreted the scope of [the Trust's] purpose" as concerning "*any* possible anticompetitive conduct by a global conglomerate at *any* time *anywhere* in the world."[61] We agree.

A "mere statement of a purpose to investigate possible general mismanagement, without more,"[62] is insufficient to establish entitlement to inspection. But the "more" that Section 220 requires is not a narrower or more "lucid" purpose. Instead, a stockholder must present some evidence to establish a credible basis of mismanagement or wrongdoing warranting further investigation.[63]

---

[59] *Seinfeld*, 909 A.2d at 118; *NVIDIA Corp.*, 282 A.3d at 25.

[60] Opening Br. at 23–26; *see also Chancery Opinion* at *4–6.

[61] *Chancery Opinion* at *5 (emphasis in original); Opening Br. at 26–35.

[62] *Seinfeld*, 909 A.2d at 122 (citation omitted).

[63] *See id.* ("A mere statement of a purpose to investigate possible general mismanagement, without more, will not entitle a shareholder to broad § 220 inspection relief. There must be *some evidence* of possible mismanagement as would warrant further investigation of the matter." (emphasis in original)); *AmerisourceBergen Corp.*, 243 A.3d at 428 ("Of course, a mere statement of suspicion is inadequate. If the stockholder cannot present a credible basis . . . from which the court can infer

16

The court concluded that it was unnecessary to reach the credible basis analysis because the scope of the purpose was "facially improper" and thus the purpose was not "lucid." Denying an inspection demand based on a facial evaluation of the "scope" of the purpose, without considering whether the evidence established a credible basis for that purpose, is not the framework under which our courts evaluate Section 220 demands.[64] The court erred by beginning and ending the analysis on this ground.[65]

The court also erred in construing the stated purpose as "concern[ing] *any* possible anticompetitive conduct by a global conglomerate at *any* time *anywhere* in

wrongdoing or mismanagement, it is likely that the stockholder's demand is an 'indiscriminate fishing expedition.'" (citation omitted)).

[64] The court's analysis does not rely on legal authority supporting denial on facial grounds, alone. The court essentially equated the Trust's Demand to an improper fishing expedition. *See Chancery Opinion* at *5 ("Mere curiosity or a desire for a fishing expedition will not suffice. The Trust's demand runs afoul of this basic requirement because its stated purpose is astoundingly broad." (quotation marks and citation omitted)). But, again, that concerns the credible basis analysis. *See, e.g.*, *Seinfeld*, 909 A.2d at 122–23 ("Investigations of meritorious allegations of possible mismanagement, waste or wrongdoing, benefit the corporation, but investigations that are 'indiscriminate fishing expeditions' do not. . . . Accordingly, this Court has held that an inspection to investigate possible wrongdoing where there is no 'credible basis,' is a license for 'fishing expeditions' and thus adverse to the interests of the corporation." (citations omitted)).

[65] We also note that, on its face, the scope of the Trust's stated purpose is not materially different than other purposes found proper by Delaware courts. *See, e.g.*, *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *1, *12 (Del. Ch. Nov. 24, 2020) (finding that a stockholder's purpose proper where it sought "to investigate possible wrongdoing in connection with [Gilead's] development, marketing, and sale of HIV drugs" and the stockholder highlighted "four categories of possible wrongdoing," including anticompetitive activity, mass torts lawsuits, patent infringement lawsuits, and False Claims Act violations); *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *12 (Del. Ch. May 30, 2019) (finding a stockholder's purpose proper where it sought to investigate wrongdoing and mismanagement by the board and senior management because they "placed user data at risk of misappropriation and failed to monitor Facebook's compliance with [an FTC] [c]onsent [d]ecree and, more generally, its efforts to protect its users' private information").

17

the world."[66]  In its Demand, the Trust expressed belief that Amazon's fiduciaries "have authorized or allowed" Amazon to "take unlawful advantage of [its] dominant [marketplace] position to engage in anticompetitive practices, leading to U.S. and international regulatory scrutiny, lawsuits, and fines."[67]  The Demand explained that "[i]n particular, [the Trust] is concerned that Amazon utilized a set of interlocking anticompetitive and unfair strategies to illegally maintain its monopoly power that benefits the products it makes and sells internally versus third-party sellers that utilize [Amazon]'s marketplace."[68]  The Demand then detailed Amazon's "history of monopolistic behavior" before moving to the FTC complaint.  Most of the Demand focused on detailing the FTC complaint.[69]

The court's interpretation of the Trust's purpose is not consistent with the Demand or the Trust's position in the litigation.  The stated purpose identified the specific examples of purported anticompetitive conduct that the Trust sought to investigate.  And the Trust's pre-trial answering brief clarified the scope of its requested inspection to "regulatory inquiries or lawsuits in the U.S. and Europe."[70]  The Trust further stated that "an appropriate timeframe for [the Trust]'s Demand is

---

[66] *Chancery Opinion* at *5.

[67] A976 (Demand Letter).

[68] *Id.*

[69] The Trust's discussion of the FTC complaint spans eleven pages of its twenty-one-page Demand. *See* A982–92 (Demand Letter).

[70] A1779 (Trust's Pre-Trial Answering Brief).

September 2018 through the present."[71]  That is, before trial, the Trust limited the

scope of its stated purpose by geographic region (United States and Europe), content

(lawsuits and regulatory inquiries), and timeframe (September 2018 through

present).  This Court has held that limiting the scope of a Section 220 demand during

the course of litigation is permissible "if such narrowing does not prejudice the

defendant."[72]  Amazon has alleged no prejudice, and we find none.

The court erred in its interpretation of the scope of the Trust's purpose.  Under

the circumstances, the court was required to continue its analysis by engaging with

the evidence presented by the Trust.  We next discuss whether the Trust presented

some evidence from which a court can infer possible wrongdoing by Amazon.

B.      The Trust satisfied its credible basis burden.

The Trust also appeals the Magistrate's finding that the Trust did not establish

a credible basis.  The Trust contends that the evidence it presented to the Court of

Chancery was sufficient to establish a credible basis.  Although we afford

considerable deference to the Court of Chancery's determination as to whether a

---

[71] A1779–80 (Trust's Pre-Trial Answering Brief).

[72] *NVIDIA Corp.*, 282 A.3d at 17 ("If a Section 220 plaintiff's overarching request remains the same, the plaintiff may narrow the scope of that request throughout litigation, if such narrowing does not prejudice the defendant."); *see also Facebook*, 2019 WL 2320842, at *18 ("While Plaintiffs' lack of precision in formulating its Demand, particularly with respect to the scope of documents requested, has provoked justified frustration and has prompted questions regarding possible abuse of the Section 220 process, I am satisfied there has been no such abuse here. Plaintiffs' stated purposes for inspection have remained constant throughout the various iterations of their Demand. And their lack of focus regarding the documents they seek, while unfortunate, does not evidence a lack of good faith.").

credible basis exists,[73] we find that—contrary to the Magistrate's determination—the Trust satisfied its burden of proving a credible basis, especially considering the developments in the FTC action since the Magistrate issued the final report.

The credible basis "standard does not require stockholders to show actual waste or mismanagement."[74] Instead, stockholders "need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation—a showing that 'may ultimately fall well short of demonstrating that anything wrong occurred.'"[75] "The credible basis 'threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'"[76] This Court has repeatedly described the credible basis standard as the "lowest possible burden of proof under Delaware law."[77]

---

[73] At the outset, the parties disagree on the standard of review for this issue because the Magistrate made this determination and the Vice Chancellor did not reach it. The Trust appears to contend that we should review the issue *de novo*, while Amazon contends that we should afford considerable deference to the Magistrate's determination in the same way that we would afford such deference had the Vice Chancellor made it. We need not resolve the parties' disagreement because, even applying the considerable deference standard, we find that the Trust met its burden.

[74] *NVIDIA Corp.*, 282 A.3d at 25 (citing *Seinfeld*, 909 A.2d at 123).

[75] *Seinfeld*, 909 A.2d at 123 (internal citation omitted) (quoting *Khanna v. Covad Commc'ns Grp., Inc.*, 2004 WL 187274, at *6 n.25 (Del. Ch. Jan. 23, 2004)); *NVIDIA Corp.*, 282 A.3d at 25.

[76] *NVIDIA Corp.*, 282 A.3d at 25 (quoting *Seinfeld*, 909 A.2d at 123).

[77] *Id.* at 25–26 (internal quotation marks omitted); *Seinfeld*, 909 A.2d at 123 ("[T]he 'credible basis' standard sets the lowest possible burden of proof. The only way to reduce the burden of proof further would be to eliminate any requirement that a stockholder show *some evidence* of

20

The Magistrate explained that, where the evidence presented "primarily concerns certain government investigations and litigation," "Delaware courts have routinely looked to some additional evidence beyond ongoing inquiries or litigation to find that a plaintiff has met its burden."[78]  For that proposition, the Magistrate relied on *Amazon.com, Inc.*, where, as discussed previously, the Court of Chancery denied a stockholder's Section 220 demand because the anticompetitive conduct noted in that demand "lack[ed] the sort of 'plus factor' found" in other, similar cases.[79]  To the extent that one may read the "additional evidence" or "plus factor" language as creating a burden higher than the established credible-basis-from-some-evidence burden, that is not so.  The burden remains the same, including in cases primarily concerning ongoing government investigations and litigation.  Delaware caselaw shows that meeting this burden often requires more than a mere untested allegation of wrongdoing but does not require that the underlying litigation result in a full victory on the merits against the company.

---

possible wrongdoing.  That would be tantamount to permitting inspection based on [] 'mere suspicion[.]'" (emphasis in original)).

[78] *Final Report* at *6 (quoting *Amazon.com, Inc.*, 2022 WL 1760618, at *6–7).

[79] *Amazon.com, Inc.*, 2022 WL 1760618, at *8 ("Here, the evidence of potential malfeasance regarding alleged anticompetitive conduct lacks the sort of 'plus factor' found in . . . other cases where ongoing government investigations and lawsuits contributed to the satisfaction of the credible basis standard."); *id.* at *7 ("Accordingly, Delaware courts have routinely looked to some additional evidence beyond ongoing inquiries or litigation to find that a plaintiff has met its burden.").

In *In re Facebook, Inc. Section 220 Litigation*,[80] stockholders sought to investigate possible wrongdoing regarding whether board members and senior management "knowingly implemented policies that placed user data at risk of misappropriation and failed to monitor Facebook's compliance with [an FTC] [c]onsent [d]ecree, and, more generally, its efforts to protect its users' private information."[81] The stockholders presented the following evidence: a parliamentary report concluding that the Cambridge Analytica scandal was facilitated by Facebook's policies; an FTC consent decree mandating Facebook to monitor its compliance with specific data privacy procedures; information "released to the public sphere" indicating that Facebook sought to monetize its users' data even after entering into the consent decree; a newspaper article reporting that the board knew Facebook was allowing unauthorized access to user data; evidence that the FTC opened an investigation into whether Facebook violated the consent decree; a "£500,000" fine by European authorities for permitting third parties to access user data without consent; and "numerous lawsuits based on the same underlying conduct."[82] The court concluded that the stockholders "presented some evidence that Facebook's directors and officers may have breached their *Caremark* duties,

---

[80] *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842 (Del. Ch. May 30, 2019).

[81] *Id.* at *12.

[82] *Id.* at *13–16.

particularly in light of the [c]onsent [d]ecree in place at the time of most of the data privacy breaches alleged[.]"[83]

In *Lebanon County Employees' Retirement Fund v. AmerisourceBergen Corp.*,[84] a stockholder sought books and records to investigate alleged mismanagement by the board and management in connection with AmerisourceBergen's "distribution of prescription opioid medications."[85] The Court of Chancery determined that the stockholder established a credible basis to infer that AmerisourceBergen had been violating positive law and that those violations resulted in a corporate trauma.[86] The stockholder referenced the following evidence: an action by the West Virginia Attorney General that AmerisourceBergen paid $16 million to settle; a pending action by the New York Attorney General; a multidistrict litigation in which AmerisourceBergen was a defendant; reports by the States of West Virginia and Missouri finding that AmerisourceBergen failed to address suspicious opioid orders; and an offer by AmerisourceBergen to settle its part of the multidistrict litigation for $10 billion, which was rejected.[87] The court permitted inspection, concluding that "[w]hen a corporation has suffered a significant trauma,

---

[83] *Id.* at *16.

[84] *Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020).

[85] *Id.* at *8.

[86] *Id.* at *11.

[87] *Id.* at *10–11.

and when a stockholder can establish a credible basis to suspect a possible violation of positive law, the stockholder has stated a proper purpose[.]"[88]

In *Pettry v. Gilead Sciences, Inc.*,[89] a stockholder sought to investigate possible wrongdoing "in connection with [Gilead]'s development, marketing, and sale of HIV drugs"[90] based on "four categories of possible wrongdoing": anticompetitive activity, mass torts, patent infringement, and kick-back schemes.[91] The Court of Chancery determined that the stockholder established a credible basis for each category. Regarding the alleged anticompetitive activity, the stockholder sought to investigate activity "resulting in a multi-billion dollar lawsuit accusing Gilead of violating federal and state antitrust laws by colluding with its competitors to unlawfully extend patent protection and drive up the price of HIV drugs[.]"[92] As evidence supporting its credible basis for anticompetitive activity, the stockholder relied on a thirteen-count class action complaint filed against Gilead in federal court alleging that Gilead and other drug companies violated federal and state antitrust laws by engaging in anticompetitive conduct in the HIV-drug market.[93] The lawsuit

---

[88] *Id.* at *11 (citing *Facebook*, 2019 WL 2320842, at *15).

[89] *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461 (Del. Ch. Nov. 24, 2020).

[90] *Id.* at *1.

[91] *Id.* at *12.

[92] *Id.*

[93] *Id.* at *5–6. Later, a group of healthcare insurers filed a class action against Gilead and other companies in federal court asserting claims similar to those in the primary class action. *Id.* at *6.

sought billions of dollars in damages, and the district court granted in part and denied in part Gilead's motion to dismiss with leave to amend certain claims.[94] The Court of Chancery concluded that, because the standard to state a claim under Federal Rule of Civil Procedure 12(b)(6) is higher than Section 220's credible basis standard, it "follows that allegations which survive a motion to dismiss under the federal standard are sufficient to meet the credible basis standard."[95]

As these cases reveal, the credible basis standard remains a highly fact-intensive analysis that by its nature resists a brightline rule. But where a stockholder presents evidence of ongoing investigations and lawsuits, and those investigations and lawsuits have advanced beyond untested allegations, then the evidence can be sufficient to meet the credible basis standard, especially when liability or fines could result in a corporate trauma.

Here, the Magistrate found that the Demand identified "a handful" of lawsuits, "many of which merely repeat the allegations of the FTC [c]omplaint."[96] The Magistrate also found that the investigations noted in the Demand ended without findings of violations of the law, and that the fines paid by Amazon were "relatively

---

[94] *Id.* at *6, *13.

[95] *Id.* at *13.

[96] *Final Report* at *9.

minor[.]"[97]   Thus, the Magistrate concluded that the Trust did not satisfy its evidentiary burden.  We disagree.

The FTC complaint—filed after a four-year investigation—advanced twenty counts alleging that Amazon violated state and federal antitrust laws.[98]  Most of those claims survived Amazon's motion to dismiss.[99]  In *Gilead*, the Court of Chancery found that the stockholder presented sufficient evidence to establish a credible basis to suspect wrongdoing where that evidence arose from a class action complaint alleging violations of state and federal antitrust laws that survived in part a motion to dismiss.[100]  And, unlike *Gilead*, the FTC action is a government lawsuit. Government lawsuits can be especially probative:  "[o]ngoing investigations and lawsuits can provide the necessary evidentiary basis to suspect wrongdoing or

---

[97] *Id.*

[98] Amazon produced millions of pages of documents and answered numerous interrogatories resulting in more than one hundred pages of written responses.  A1335 (Dec. 15, 2023 Joint Status Report and Discovery Plan in FTC Action).

[99] Nearly every claim survived or was dismissed without prejudice with leave to amend.  *See* A2274–76 (Sept. 30, 2024 District Court Order).

[100] The Magistrate distinguished the FTC complaint from *Gilead* and another case, *In re UnitedHealth Group, Inc. Section 220 Litig.*, 2018 WL 1110849 (Del. Ch. Feb. 28, 2018), finding that "[u]nlike the government complaints in *UnitedHealth Group* and *Gilead*, the FTC [c]omplaint does not extensively quote testimony or attach documents on which it relies, so the [c]ourt cannot evaluate the underlying evidence . . ..  The allegations in the FTC [c]omplaint could be sufficient, if supported by additional evidence, but they alone do not satisfy the credible basis standard." *Final Report* at *7.  At the time that the Magistrate issued the final report, the district court had not resolved Amazon's motion to dismiss.  But while the court was considering the Trust's exceptions to the Magistrate's final report, the Trust supplemented the record with the district court's decision, which largely denied the motion to dismiss.  We need not opine on whether the evidence taken together, without the district court order, would have been sufficient to satisfy the Trust's burden.

mismanagement warranting further investigation. This type of evidence is stronger when governmental agencies or arms of law enforcement have conducted the investigations or pursued the lawsuits."[101]

The Trust presented additional evidence from which the court could infer possible wrongdoing, including the lawsuit filed by the State of California, which is ongoing after that court denied Amazon's demurrer.[102] That case concerns Amazon's alleged violations of California antitrust law for contracting with its third-party sellers and wholesale suppliers to prevent competition.[103] Additionally, although the lawsuit filed by the State of Washington ended with a negligible monetary payment and no admission of liability, Amazon entered into a consent decree agreeing to stop its "Sold by Amazon" program and further agreeing to give the Washington Attorney General's Office annual updates on compliance with antitrust laws.[104] And Amazon paid a €1.13 billion fine to the Italian Competition Authority due to "certain of [Amazon's] marketplace and logistics practices in Italy infring[ing] EU competition rules."[105]

---

[101] *AmerisourceBergen Corp.*, 2020 WL 132752, at *9 & nn.5–6 (collecting cases).

[102] A643–52 (Mar. 30, 2023 Order on Amazon's Demurrer).

[103] *See* A620–23 (Sept. 15, 2022 State of California Complaint) (asserting claims under the California Cartwright Act and California Unfair Competition Law).

[104] The consent decree is effective for five years and is active until early 2027. *See* A510 (Jan. 26, 2022 Consent Decree).

[105] A657 (Amazon Form 10-Q). Per Amazon's 2023 Q1 Form 10-Q, it has paid the fine but will seek to recover it "pending conclusion of all appeals." *Id.*

Each of those investigations, viewed in isolation, might not meet the Trust's burden. But taken together, the FTC action, the State of California action, the State of Washington consent decree, and the Italian Competition Authority fine are sufficient to establish a credible basis from which a court can infer that Amazon has engaged in possible wrongdoing through its purported anticompetitive activities.[106] Delaware courts have a "duty to closely examine any Section 220 demand to 'prevent possible abuse of the shareholder's right of inspection.'"[107] We have done so and find no abuse here.

## IV. CONCLUSION

The court erred in its interpretation of the scope of the Trust's purpose and was required to engage with the evidence presented by the Trust. And the Trust established a credible basis to infer possible wrongdoing. We reverse the judgment

---

[106] The Trust's other evidence is less probative of wrongdoing. We agree with the Magistrate that the European Commission's investigation does little to advance the Trust's cause. We have reviewed the commitments made by Amazon and do not find that those commitments create an inference of wrongdoing. The other events noted in the Demand were dismissed as insufficient in *Amazon.com, Inc. See Final Report* at \*6 (noting that the Court of Chancery previously determined in *Amazon.com, Inc.* that the evidence "predating June 2022 did not provide a credible basis to suspect wrongdoing concerning Amazon's antitrust compliance"); *Amazon.com, Inc.*, 2022 WL 1760618, at \*8–10. We find no reason—and the Trust has not advanced a persuasive one—to revisit those findings from *Amazon.com, Inc.* here.

[107] *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 164 (Del. Ch. 2006) (quoting *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 793–94 (Del. 1982)); *see also id.* at 168 ("[I]t is not the court's responsibility to pick through the debris of a Section 220 demand in [a] state of disarray and to find the few documents that might be justified as necessary and essential to the plaintiff's demand."). The Demand here is not in a state of disarray. As the Magistrate noted, the Demand identified a "handful" of lawsuits and government investigations.

of the Court of Chancery and remand for further proceedings to determine the scope

and conditions of production consistent with this decision.